UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                   :
MICHAEL W. PATRICK,                                                :
                                                                   :
                                                                   :
                              Plaintiff,                           :
                                                                   :          23-cv-10942 (LJL)
              -v-                                                   :
                                                                   :          OPINION AND ORDER
KILOLO KIJAKAZI,                                                   :
                                                                   :
                              Defendant.                           :
                                                                   :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 05/20/2026

LEWIS J. LIMAN, United States District Judge:

Plaintiff Michael Patrick ("Plaintiff" or "Patrick") moves, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings. Dkt. No. 10. Administrative Law Judge Michael J. Stacchini ("ALJ") found that Plaintiff was not disabled under the Social Security Act and therefore denied Plaintiff's application for a period of disability and disability benefits. Plaintiff submits that the ALJ's determination was not supported by substantial evidence and that the ALJ erred in his evaluation of the opinion evidence and relevant regulatory factors. *Id.* at 11–20. Plaintiff asks that the Court enter an order reversing the decision and/or remanding the matter to the ALJ. The Commissioner of Social Security ("Commissioner") cross-moves for judgment on the pleadings and an order affirming the ALJ's decision. Dkt. No. 13. For the following reasons, Plaintiff's motion is granted, the Commissioner's motion is denied, and the case is remanded to the ALJ for further proceedings.

## BACKGROUND

The following facts are taken from the administrative record (the "Record") filed in connection with this action. Dkt. No. 9. The Record contains Plaintiff's medical history, a

consultative examiner's opinion, two administrative psychological findings, the transcript of Plaintiff's hearing before the ALJ, and the ALJ's decision.

Plaintiff was born in 1991 and was twenty-nine years old at the alleged onset date ("AOD") of his disability on June 15, 2021. *Id.* at 67. He was last employed in January of 2019, when he worked as a sales associate for six months before he was fired due to disagreements with his coworkers stemming, in part, from a persistent paranoid belief that all his coworkers were using drugs. *Id.* at 290, 563. He first received psychiatric care in May of 2020 for diagnoses of anxiety disorder and depressive disorder, and over the course of that summer was additionally diagnosed with obsessive compulsive disorder ("OCD") and paranoid schizophrenia. *Id.* at 1024. Following a period of noncompliance with psychiatric care and subsequent hospitalization in June of 2021, he sought disability benefits. *Id.* at 17, 1328.

Plaintiff filed a claim for supplemental security income on August 2, 2021, alleging disability due to schizophrenia with an onset date of June 15, 2021. *Id.* at 17, 184–85, 198. The claim was denied on January 3, 2022, and denied again upon reconsideration on April 5, 2022. *Id.* at 17. Following Plaintiff's request for a hearing, the ALJ held a hearing on July 19, 2022, *id.* at 30, and subsequently denied Plaintiff's application on November 3, 2022, *id.* at 14. At the time of his application, Plaintiff resided in a mobile home with his mother and sister but described plans to move into a group home for men with mental disabilities. *Id.* at 40.

The Court summarizes the record evidence considered at the hearing below.

## I.       Medical Records

Plaintiff primarily received psychiatric treatment from Family Services Inc. ("Family Services"), and submitted treatment records for the period from May 29, 2020 to May 13, 2022. *Id.* at 721–1025 (records from May 29, 2020 to May 13, 2022), 421–562 (records from June 18, 2020 to November 12, 2021), 567–820 (records from June 16, 2021 to January 20, 2022).

2

Plaintiff additionally received in-patient treatment at Albany Medical Center ("AMC") from May 27, 2021 to May 28, 2021, and from June 4, 2021 to June 15, 2021, and submitted his corresponding medical records.  Dkt. No. 9 at 319–420, 1026–1342.

### A.    Initial Diagnoses and Treatment

Plaintiff began therapy treatment for anxiety disorder and depressive disorder at Family Services beginning on May 29, 2020.  Dkt. No. 9 at 1024, 1014.  He was later diagnosed with OCD and paranoid schizophrenia on June 18, 2020 and August 20, 2020, respectively.  *Id.* at 1014.  During a psychotherapy appointment on August 26, 2020, the provider noted that Plaintiff "is denying hearing voices or engaging in bizarre behaviors even though his mother" had called several times to report behaviors that were "unusual and bizarre at best."  *Id.* at 534.

In February 2021, Plaintiff moved from Dutchess County to Albany and became non-compliant with his prescribed psychiatric treatment.  *Id.* 1328.  While staying at a homeless shelter, Plaintiff voiced suicidal ideation and plans to "jump off of a bridge or shoot himself."  *Id.* at 1110.  He was subsequently seen in the emergency room at AMC on May 27, 2021, where he reported a history of major depressive disorder, OCD, anxiety disorder, adjustment disorder, schizophrenia, and an unspecified psychotic disorder.  *Id.* at 365.  During the visit, Plaintiff reported two past suicide attempts and psychiatric hospitalizations, beginning when he was 14 years old.  *Id.* at 1207.  Plaintiff later reported experiencing auditory hallucinations beginning when he was 18 years old.  *Id.* at 78, 933.  Physician Evaluation reports throughout his hospitalization detail Plaintiff's delusions, hallucinations, depression, anxiety, "paranoid ideations, and bizarre behavior."  *Id.* at 1214.

After being prescribed medication and discharged, Plaintiff voluntarily admitted himself to AMC again on June 4, 2021 for further treatment.  *Id.* at 1162.  Plaintiff presented with psychosis, including delusions of running for political office.  *Id.* at 1159.  In his Psychiatric

Intake assessment, Plaintiff denied any auditory verbal hallucinations yet described hearing "his friend's voice" and "seeing things grow." *Id.* at 1160. Upon improvement of his condition, he was prescribed Risperidone to treat his schizophrenia and discharged. *Id.* at 1306. Plaintiff's discharge on June 15, 2021 coincides with the alleged onset of his disability. *Id.* at 1155.

### B.    Post-AOD Psychiatric Treatment

Plaintiff virtually attended his first psychotherapy appointment with Family Services after his discharge from AMC on June 16, 2021. *Id.* at 944. At his psychiatric assessment the following day, Plaintiff described worthlessness, feeling depressed, being fatigued easily, and suffering from anxiety. *Id.* at 709. Plaintiff further expressed living "with [the] constant feeling something bad is going to happen to him" and that "worrying stops him from getting things done that he needs to get done," as well as experiencing "heart racing, nervous, sweating, shaking." *Id.* Moreover, Plaintiff reported hearing voices, explaining: "people I used to be friends with, they tell me to do things like jump off a building . . . when I'm alone, it feels like people are watching me." *Id.* at 933. The report lists diagnoses of paranoid schizophrenia, OCD, anxiety disorder, and depressive disorders. *Id.* at 936. Plaintiff's medication plan was to continue the monthly Invega Sustenna injections (which he had first received in the hospital) to treat his psychosis, and Prozac to manage his anxiety. *Id.* at 937–938.

Between Plaintiff's appointment with Family Services on June 16, 2021 and the final appointment contained in the Record on May 13, 2022, the Record contains largely repetitive treatment notes from Plaintiff's weekly virtual psychotherapy and medication management appointments for continuing diagnoses of schizophrenia, OCD, and anxiety disorder. *Id.* at 721–944. Plaintiff continued to generally report doing well on his medications, doing fairly well overall, and continuing his focus on various strategies for self-improvement. *Id.* at 793, 813, 828, 834, 847, 853, 866, 911, 923.

After reporting that he was sleeping only one to two hours per night on October 28, 2021, Plaintiff was prescribed Trazodone, an anti-depressant to treat his problems with sleep. *Id.* at 842. Due to the continued lack of improvement in sleep, Plaintiff's dose of Trazodone was increased on November 24, 2021, December 22, 2021. and January 20, 2022. *Id.* at 788, 807, 822. Plaintiff's medication management notes thereafter are positive overall and he reported sleeping six hours per night on March 24, 2022. *Id.* at 752. Psychotherapy reports during the same period repeat that Plaintiff's mood was fair or good, with an increase in stress due to the SSI denial and appeal noted in February of 2022. *Id.* at 773. The final report included in the Record, obtained on May 13, 2022, describes Plaintiff in a positive mood overall and excited about moving into a group home. *Id.* at 724.

Every Family Services report since his initial appointment in May of 2020 describes that "client experiences anxiety as characterized by the following . . . episodes of severe fear, worry, and somatic symptoms; excessive worry occurring more days than not about a number of events or activities; repetitive behaviors to cope with anxiety; avoidance of triggers to anxiety; diminished social, school, and occupational functioning." *Id.* at 437, 454, 466, 478, 521, 525, 561, 572, 590, 604, 641, 680, 728, 744, 760, 779, 952, 958, 962, 972, 979, 1023. They also all report that "client experiences depression as characterized by the following . . . diminished interest in previously enjoyed activities, social isolation, diminished functioning in social/occupational/educational settings, disturbances in sleep and/or appetite, feelings of hopelessness/worthlessness, thoughts of suicide and/or suicidal and self-destructive behaviors, irritability, guilt, behavioral problems." *Id.* The reports also consistently document that "client exhibits psychosis, as characterized by . . . disorganized thinking, agitation, delusions, hallucinations, paranoid ideation, and/or poor self-care." *Id.* at 1023.

II.     **Plaintiff and Third-Party Reports**

A.     **Plaintiff's Self-Reports**

In a self-report from October 22, 2021, Plaintiff stated that his schizophrenia limits his ability to work because it makes him hear voices that are not there, makes him paranoid about his coworkers, and makes it more difficult to get along with others. *Id.* at 204, 209.  He reported that he can pay attention for one hour and that when he starts something, such as a conversation, chores, reading, or watching a movie, he finishes it. *Id.* at 209.  Plaintiff also reported being able to follow instructions, get along with authority figures, and handle stress and changes in routine well. *Id.* at 209–10.  He also denied having ever been fired or laid off from a job because of problems getting along with other people. *Id.*  Plaintiff stated that he never goes outside except to mow the lawn, spends his days watching television, playing video games, reading, and eating meals, and goes to the supermarket with his aunt on the weekends. *Id.* at 205.

Plaintiff completed a second self-report on March 11, 2022. *Id.* at 253.  In this report, Plaintiff stated: "My illnesses limit my ability to work because I hear voices that make me nervous and it is hard to follow instructions.  I also have anxiety that makes it hard to follow instructions.  I also have depression and some days can't get out of bed." *Id.* at 246.  He also explained that he is no longer able to work and hold a job because he was fired for not following instructions. *Id.* at 247.  Plaintiff stated he does not always eat three meals a day when he is depressed, further explaining that "since the illness I don't eat as often and it's more difficult to prepare the meals." *Id.* at 248.  He reported that he needs to be reminded to do laundry, mow the lawn, shower, and change his clothes, and that he does not trust himself with a savings account because he hears voices. *Id.* at 247–49.  Plaintiff repeated the daily hobbies listed in the previous self-report, but he adds that "I have some trouble because I can not concentrate for very long" and "since my illnesses I find it more difficult to concentrate." *Id.* at 250.

In addition to affirming his previously reported difficulties with hearing voices and getting along with others, Plaintiff asserted that his schizophrenia affects talking, memory, completing tasks, concentration, understanding, and following instructions. *Id.* at 251. In explaining these assertions, Plaintiff stated, "Because of my schizophrenia I have trouble in conversations talking and hearing. I often forget things affecting my memory and completing tasks. I can't concentrate when I hear voices. I sometimes listen to voices in my head affecting understanding, following instructions, and getting along with others." *Id.* at 251. Plaintiff again reported that he is able to pay attention for one hour. *Id.* at 251. He reported not being able to finish what he starts, and a limited ability to follow instructions due to sometimes hearing voices that he listens to instead. *Id.* at 251. Moreover, Plaintiff stated: "I experience anxiety and don't always follow instructions . . . I don't always get along with authority figures because I listen to voices I hear instead . . . I don't always handle stress well, sometimes it makes me feel suicidal and sometimes I can't sleep . . . I can handle changes in routine fairly well." *Id.* at 251–52. He also affirmed noticing unusual behavior or fears, elaborating that, "I have paranoid-schizophrenia and anxiety so sometimes I am afraid of going to jail for not having any money." *Id.* at 252. Contrary to his previous October 22, 2021 self-report where he marked "no" when asked if had ever been fired or laid off from a job because of problems getting along with other people*, see id.* at 209, Plaintiff answered "yes" to the same question in the March 11, 2022 report, explaining that he was fired from his previous job for not listening to instructions because he had anxiety and felt like people were watching him, *id.* at 251.

## B.    Plaintiff's Mother's Third-Party Report

In a third-party report completed on October 22, 2021, Plaintiff's mother stated that Plaintiff's condition limits his ability to work because "he gets paranoid at work. He becomes suspicious of other co-workers. He's been known to imagine horrible things he believes they're

doing." *Id.* at 220.  In describing his daily activities, Plaintiff's mother stated that he spends a lot of time alone playing video games, watching TV, or reading, and he sleeps a lot, lies in bed awake, and sometimes skips meals. *Id.* at 221.  She reported that his condition "makes him sleep a lot" and he is "sometimes in bed most of the day." *Id.*  She affirmed that he needs to be reminded to shower but does his own laundry, washes dishes, and mows the lawn every two weeks. *Id.* at 222.  Plaintiff's mother stated that Plaintiff has not driven in two years because he is not able to focus clearly and sold his car. *Id.* at 223.  She corroborated that Plaintiff sometimes has difficulty reading and focusing, and that, since the condition began, his "focus is not always the same." *Id.* at 224.  Additionally, she selected memory, completing tasks, concentration, understanding, and following instructions as the abilities affected by his condition. *Id.* at 225.  In her explanation for these selections, Plaintiff's mother describes that "focus and concentration are affected due to illness.  Tired a lot, doesn't always do thorough job when doing chores.  Can need reminders to do simple tasks like taking out garbage or doing laundry." *Id.* at 225.  At the same time, his mother answered questions about how long Plaintiff can pay attention and how well he can follow written instructions such as a recipe, with, respectively, "Depends—usually for a while" and "Usually can do this—depends on focus." *Id.*  When answering how well Plaintiff follows spoken instructions, however, she stated that he "sometimes forgets what you say to him." *Id.*

Plaintiff's mother reported that he "obeys authority figures without much resistance," that he was let go from his job due to his illness, and "kicked out of school for inappropriate behavior before his diagnoses or meds." *Id.* at 227.  She asserts that he does not handle stress well as he "becomes very anxious and restless.  Meds have improved this but still an issue." *Id.*  Finally, Plaintiff's mother stated that, "prior to meds [he] heard voices, talked to himself, laughed when

8

alone.  When he did see others [he] would talk to them and make them concerned about him.
Conversations didn't make sense."  *Id.* at 227.

### III.    Expert Reports

The ALJ considered reports from three experts.  The first, Dr. Corey Anne Grassl, Psy.
D., performed a psychiatric consultative examination with Plaintiff and issued a report on
December 8, 2021.  *Id.* at 563.  Plaintiff's records were also examined by two state agency
psychological examiners.  S. Hennessey, Ph. D., ("Dr. Hennessey") issued a report on December
30, 2021 that was considered in the initial determination process.  *Id.* at 67.  On reconsideration,
state agency psychological examiner M. Momot-Baker, Ph. D., ("Dr. Momot-Baker") provided a
second report, issued on April 4, 2022.  *Id.* at 89.

#### A.    Dr. Grassl—Psychiatric Consultative Examination

During the initial review of Plaintiff's SSI application, a psychiatric consultative
examination was performed by Dr. Grassl, on December 08, 2021, via teleconference.  *Id.* at 563.
Dr. Grassl noted that Plaintiff experiences "nightly auditory hallucinations, command type,
paranoid ideation, delusions that his co-workers were all using drugs," and that "he continues to
ruminate about his co-workers from 2019 using drugs."  *Id.*  Plaintiff also reported sleeping
normally, a normal appetite, occasional depressive symptoms, and difficulties concentrating, and
that he can do all skills of daily living independently.  In the Medical Status Examination
("MSE"), Dr. Grassl reported that Plaintiff's thought processes were coherent and goal directed
with no evidence of hallucinations, delusions, or paranoia in the evaluative setting.  The MSE
described intact attention and concentration, noting that "he could count to 20, do simple
calculations, and do serial 7s," but Dr. Grassl determined that Plaintiff "is moderately limited in
his ability to sustain concentration and perform a task at a consistent pace, sustain an ordinary
routine and regular attendance at work, and regulate emotions, control behavior, and maintain

9

well-being." *Id.* at 564–65.  Dr. Grassl also found "no evidence of limitation in his ability to understand, remember, and apply simple directions and instructions; understand, remember, and apply complex directions and instructions; use reason and judgment to make work related decisions; interact adequately with supervisors, coworkers, and the public; maintain personal hygiene and appropriate attire; and be aware of normal hazards and take appropriate precautions." *Id.* at 565.  Dr. Grassl further noted that Plaintiff's "difficulties are caused by psychiatric problems," and that the examination's results are "consistent with psychiatric problems, and this may significantly interfere with the claimant's ability to function on a daily basis." *Id.*  Following the examination, Dr. Grassl diagnosed Plaintiff with "schizoaffective disorder, depressive type" and reported his prognosis as "guarded, given [Plaintiff] continues to experience auditory hallucinations and paranoid thoughts." *Id.* at 566.

### B.    Dr. Hennessey's Report

In the initial determination process, Dr. Hennessey reviewed Plaintiff's records and prepared a report on December 30, 2021.  Dr. Hennessey found that Plaintiff suffered from medically determinable impairments listed as "Schizophrenia Spectrum and Other Psychotic Disorders," "Depressive, Bipolar, and Related Disorders," and "Anxiety and Obsessive-Compulsive Disorders." *Id.* at 71.  Dr. Hennessey assessed Plaintiff's "primary" medically determinable impairment as "severe," with a moderate limitation on the ability to concentrate, persist, or maintain pace, and mild limitations on the ability to understand, remember, or apply information, interact with others, and adapt or manage oneself. *Id.*  The report further lists Plaintiff's symptoms as "sustained concentration and persistence limitations," "social interaction limitations," and "ability to adapt limitations." *Id.* at 73.  In the mental residual functional capacity ("MRFC") assessment, Dr. Hennessey reasserted that Plaintiff has limitations in sustained concentration and persistence, and, more specifically, that he was moderately limited

in "the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," and moderately limited in "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," but not significantly limited in the remaining categories.

Dr. Hennessey ended the assessment with an additional explanation, noting, in relevant part, that Plaintiff's self-completed ADL form indicated that "he pays attention for one hour, has no problem getting along with friends and family, gets along alright with people at work, and handles stress well." *Id.* at 78. Dr. Hennessey concluded by summarizing his findings as follows:

> Overall, the findings were consistent with a moderate limitation in sustained concentration with the ability to complete detailed tasks.
>
> Data support the presence of a severe psychiatric impairment that results in more than minimal functional limitations. Despite these, the claimant retains the mental residual functional capacity to perform tasks at, but not beyond, the following levels:
>
> I. Understanding and Memory: The claimant is able to understand and remember detailed, non-complex instructions and work procedures.
>
> II. Sustained Concentration and Persistence: The claimant is able to complete detailed, non-complex tasks on a consistent basis.
>
> III. Social Interaction: The claimant does have the ability to relate appropriately to coworkers and supervisors.
>
> IV. Adaptation: The claimant can adapt to changes in detailed, non-complex task environment and can use appropriate judgment to make effective task-related decisions in such settings.

*Id.* at 78. Finally, Dr. Hennessey acknowledged that a finding regarding Plaintiff's capacity for past relevant work ("PRW") had not been made, but he suggested that Plaintiff could adjust to other work and is not limited to unskilled work because of his impairments. *Id.* at 79–80.

11

### C.    Dr. Momot-Baker's Report

On reconsideration, Dr. Momot-Baker submitted an additional report on April 4, 2022, that largely mirrored Dr. Hennessey's findings. *Id.* at 105. Dr. Momot-Baker, however, found that Plaintiff had moderate rather than mild limitations in the ability to "interact with others," "adapt or manage oneself," in addition to the previous finding of moderate limitation in "concentrate, persist, or maintain pace." *Id.* at 96. In the MRFC stage, Dr. Momot-Baker upheld Dr. Hennessey's limitation ratings including moderate limitations in the ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," and "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," but found that Plaintiff was also moderately limited in "the ability to respond appropriately to changes in the work setting," and "the ability to interact appropriately with the general public." *Id.* at 99–100. Accordingly, Dr. Momot-Baker departed from Dr. Hennessey's previous determination and determined that Plaintiff is limited to unskilled work because of the impairment. *Id.* at 104.

## IV.    Administrative Hearing and Decision

The ALJ held a hearing via teleconference on July 19, 2022. *Id.* at 32. Plaintiff was represented at the hearing by an attorney, Milena Pisano-Mcnally. *Id.* at 17. At the hearing, the ALJ heard testimony from both Plaintiff and vocational expert (the "VE") Jessica Conrad. *Id.* at 32, 57.

### A.    Plaintiff's Testimony

Plaintiff testified that, due to his depression, he spends a lot of time in bed and does not have the energy to get out of bed during the day. *Id.* at 38, 41. He also described plans to move out of his mother's mobile home and to move into a group home for individuals with mental

disabilities because his mother was getting older and he felt there are certain things, like paying bills on time and remembering to shower, that he might not be able to take care of on his own. *Id.* at 40–41.  The ALJ then asked Plaintiff to explain the inconsistency between his testimony about experiencing depression and anxiety and his treatment records, in which he reported a stable and good mood overall.  *Id.* at 41–42.  Plaintiff responded that, "Well, I'm not really telling them about like some of the depression, anxiety."  *Id.* at 42.  When the ALJ asked why he was not reporting those symptoms, Plaintiff stated, "they ask questions like—he asked me if I'm like hearing or seeing things that aren't there, and I tell him that I'm not, and that's basically it."  *Id.* at 42.

The ALJ proceeded to questions about Plaintiff's ability to work.  He first asked why Plaintiff was not currently working, and Plaintiff replied that: "Well, I'm having depression that like I spend a lot of time in bed, and I experience anxiety around other people.  Like they don't ask me if I had anxiety around other people usually when I have like the appointments with them, but I feel like too anxious.  Like I wouldn't be able to drive a car.  I feel like I would like get into a car accident like too easily because I have like anxiety."  *Id.* at 42.  Plaintiff explained that even working a simple job such as one packing boxes would be difficult because his anxiety and depression "would not stop at work, or it might be too difficult or overwhelming."  *Id.* at 43.  He further explained that "with the depression, there's like lack of motivation.  Like I kind of like feel like really down and have like low self-esteem, and I feel like just spending a lot of time in bed; and with the anxiety, I feel like it could be overwhelming, like I might be too nervous about like things going right at work."  *Id.*  Plaintiff also testified that, while the psychosis is largely controlled with medication, he has symptoms related to his schizophrenia including "lack of motivation, inability to pay attention, social isolation" and he feels nervous around people,

13

leading to "difficulty thinking clearly, withdrawal from friends and family, and decline in self-care." *Id.* at 44.

When examined by his attorney, Plaintiff revealed that he gained 50 pounds over the prior couple of months, and weighed 180 pounds. *Id.* at 46–47. Plaintiff testified that he feels fatigued and sleeps for three hours during the day, around three days a week. *Id.* at 47. He described having an inability to focus for a long period of time and trouble concentrating because he gets distracted and his mind gets blurry. *Id.* at 52. Plaintiff further described being able to play video games for one hour at a time before he gets fatigued and lays back down. *Id.* He expressed difficulty completing tasks such as reading or laundry. *Id.* at 53.

In his testimony, Plaintiff also affirmed that he still occasionally experiences thoughts about death or suicide, explaining that: "I think about like going to sleep and not waking up." *Id.* at 53. When asked by the ALJ why treatment records from the previous year indicated that he denied experiencing suicidal thoughts, Plaintiff stated that he did not tell his doctor about the thoughts. *Id.* Plaintiff also described experiencing anxiety two or three days a week, triggered by stress from upcoming events. He stated that his anxiety makes him retreat into his room and spend the day in bed, and that, during some months, he has a hard time leaving the house and does not want to be around the public. *Id.* at 54. Plaintiff testified that he experienced panic attacks once a month that stopped two months before. *Id.* at 54–55.

Plaintiff testified that, during his job as a sales representative, he was experiencing hallucinations and delusions including believing the company was affiliated with the Secret Service and earning money for the military. *Id.* at 48–49. While working there, Plaintiff explained that he had trouble getting along with others and reported that he was not listening to the associates because he was more preoccupied with the delusions in his head. *Id.* at 48–49.

14

Prior to this role, he experienced hallucinations while working at a grocery store and believes these symptoms could develop again if he were able to get that job now as he did not know what triggered the hallucinations. *Id.* at 49. Plaintiff stated that, when taking his medicine as prescribed, he did not hear voices or experience delusions but that he still sometimes experiences paranoia. *Id.* at 50. Plaintiff concluded his testimony by asserting: "I feel like depressed during the day. Like I want to spend a lot of time in bed and I don't really have the energy to get up and do anything, and I feel anxiety around like other people and like under the stresses of work. I would feel too much anxiety to like drive a car or hold a job; and because of the schizophrenia, I have like some like inability to pay attention, lack of motivation, difficulty thinking clearly." *Id.* at 56.

### B.     Vocational Expert's Testimony

Vocational Expert Jessica Conrad (the "VE") also testified. The ALJ asked the VE to "assume a hypothetical individual of the claimant's age, education, and work experience without exertional limitations. However, this individual would be limited to understanding, remembering, and carrying out simple, routine tasks throughout the eight-hour workday, with regular breaks at two hour intervals, with decision making and changes in work setting only relates to simple, routine tasks and up to occasional interaction with the general public, co-workers, and supervisors." *Id.* at 58. The VE testified that such an individual could not perform the past work as a sales associate. *Id.* at 57–58. The VE, however, provided three examples of jobs that could be performed: hand packager, cleaner, and small parts assembler, of which there existed, respectively, approximately 162,000, 1.3 million, and 195,000 positions in the United States. *Id.* at 58.

The ALJ and VE then had the following exchange, with "Q" indicating a question from the ALJ:

Q: I know from past hearings you told me that anything more than 10% of the workday, in addition to regular scheduled breaks, [precludes] full time work. So if an individual was to miss 15% of the workday in addition to regular scheduled breaks, that would preclude all full time work, correct?

A: I'm sorry. Do you mean miss 15% of the workday, off task 15% of the workday?

Q: Yes. He was going to be off task 15% of the workday. That precludes all full-time work, correct?

A: Correct.

Q: And those regular scheduled breaks are generally 15 minutes in the morning, 15 minutes in the afternoon, and 1/2 hour to one hour midday?

A: Correct.

Q: And if, in the alternative, the individual was to miss two days of work a month, that's going to preclude all full-time work as well, correct?

A: Correct.

Q: Your testimony—I know there's a portion of the hypothetical where the DOT [Dictionary of Occupational Titles] is silent, such as missing days of work or time off task, regular breaks, but there's no portion of the hypothetical where the DOT is inconsistent with your testimony, is that correct?

A: Correct.

Q: And anywhere where the DOT is silent, that's based on your training, experience, observation of jobs being performed, and for parts of hypothetical extrapolating out portions of the DOT via your testimony, is that correct?

A: Correct.

*Id.* at 58–59.

In Plaintiff's counsel's cross-examination of the VE, he asked whether greater than occasional interaction with a supervisor, as the hypothetical was limited to, would be required during the training period. *Id.* at 61. The VE testified that training "could require more than occasional interaction during that brief training period" and that, "when I give these three jobs, though, I do it under the assumption that the individual has been trained and they're on the job

16

performing the essential functions of the job." *Id.* The ALJ interjected with questioning, however, and the VE agreed that all of the jobs could be taught by mere demonstration and that "if an individual is having more than occasional interaction with their supervisors it would mean that their job performance is not satisfactory." *Id.* at 62.

### C.    The ALJ's Decision

On November 3, 2022, the ALJ issued a decision finding that Plaintiff was not disabled under section 1614(a)(3)(A) of the SSA. *Id.* at 25. In reviewing Plaintiff's claim, the ALJ employed the five-step analysis set forth in 20 C.F.R. 416.920(a). *Id.* at 18. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date on August 2, 2021. *Id.* at 19. The ALJ then found that Plaintiff's impairments—depressive disorder, anxiety disorder, OCD and schizophrenia—are "severe" and satisfy step two. *Id.* ("The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28" (citing 20 C.F.R. 416.920(c))).

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926)." *Id.* This finding was based on the ALJ's determination that Plaintiff had the following moderate limitations: interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* at 20. In explaining the finding as to concentration, persistence, and pace ("CPP"), the ALJ noted that Plaintiff "had intact attention and concentration during mental status examinations, including the consultative examination . . . [but] testified to some difficulty in concentration." *Id.* at 20. The ALJ found Plaintiff had a mild limitation in understanding, remembering, or applying information. *Id.* at 19. The ALJ also concluded that Plaintiff had "average intelligence and intact memory, attention and concentration. . . . with no difficulty

17

understanding questions and directions at examinations or the hearing." *Id.* 19–20.  In sum, the

ALJ concluded that "Because the claimant's mental impairments do not cause at least two

'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria are not satisfied" and

continued to step four.  *Id.* at 20.

At step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and

concluded:

> "[T]he claimant has the residual functional capacity to perform a full range of work
> at all exertional levels but with the following nonexertional limitations: the claimant
> can understand, remember, carry out simple routine tasks with decision making and
> changes in work setting related to simple routine tasks and is limited to occasional
> interaction with the general public, coworkers supervisors."

*Id.* at 20.  The ALJ noted that the restriction to "simple routine tasks" reflected both Plaintiff's

"history of schizophrenia and depressive and anxiety disorders" and his "complaints of attention

difficulties and low motivation."  *Id.* at 23.  The limitation of "occasional interaction" with others

reflected Plaintiff's report "that he rarely socialized."  *Id.*

In making this determination, the ALJ found that Plaintiff's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms," but that his

"statements concerning the intensity, persistence and limiting effects of these symptoms are

found to be inconsistent with the objective evidence in the case record."  *Id.* at 22.  In particular,

the ALJ found that though Plaintiff "testified that he spends his time in bed, has low motivation

and concentration difficulties[,] . . . these complaints are not reflected in his reports to the

treating sources," to whom he "reported that he was doing well, eating and sleeping well and

denied complaints or side effects."  *Id.* 23.

The ALJ found persuasive Dr. Momot-Baker and Dr. Hennessey's reports as to Plaintiff's

mild to moderate mental limitations and found Dr. Hennessey's report of additional limitations

consistent with the records.  *Id.*  The ALJ concluded that the findings of the two doctors were

18

consistent with the mental status examination at the consultative examination and with Plaintiff's treatment records. *Id.* The ALJ found partially persuasive the opinion of the consultative examiner, Dr. Grassl. *Id.* He noted that "the portion of the opinion which found no limitations in understanding and remembering complex instructions or interacting with others is not consistent with the claimant's lack of socialization and complaints of some difficulty focusing." *Id.* He credited the other aspects of Dr. Grassl's opinion:

> Overall, the opinion is well supported by the mental status examination. Specifically, the examination revealed that the claimant had an adequate manner for relating, with normal motor behavior and eye contact, adequate speech and coherent and goal oriented thought process with no evidence of hallucinations or delusions. He had a euthymic mood, flat affect and intact attention, concentration and memory with average cognitive functioning. In addition, it is consistent with the claimant course of treatment, examinations, and response to treatment since his protective filing date as detailed above. Specifically, with treatment, repeated progress notes show normal mental status examination findings and repeated notes of the claimant having a good mood, denying psychotic symptoms and having good sleeping and eating habits and no side effects.

*Id.*

Proceeding to step four, the ALJ found that Plaintiff was unable to perform any past relevant work. *Id.* at 24. Plaintiff previously worked as a sales representative, and the ALJ found that "this work required more than occasional interaction with others" and credited the vocational expert's testimony "that a hypothetical person of the claimant's age, education, past work and residual functional capacity would be unable to perform this job." *Id.*

At the last step, based on "the claimant's age, education, work experience, and residual functional capacity" and the testimony of the vocational expert, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform," and that Plaintiff "is capable of making a successful adjustment to other work." *Id.* at 24–25. Thus, Plaintiff was found to not be under a disability since the date he filed his application. *Id.* at 25.

On January 3, 2023, Plaintiff sought review of the ALJ's decision by the Appeals Council, which denied the request on November 3, 2023, rendering the ALJ's decision the Commissioner's final decision. *Id.* at 5.

## PROCEDURAL HISTORY

Plaintiff initiated this case by filing a complaint on December 18, 2023. Dkt. No. 1. The administrative record was filed on March 21, 2024. Dkt. No. 9. Plaintiff moved for judgment on the pleadings on May 07, 2024, with an accompanying memorandum of law. The Commissioner filed a memorandum of law in opposition to the motion on July 15, 2024. Dkt. No. 13. Plaintiff filed a reply memorandum of law in further support of his motion on July 24, 2024. Dkt. No. 14.

## LEGAL STANDARD

### A.     Judicial Review

A judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes that no material issue of fact remains to be resolved" such that a judgment on the merits can be made "merely by considering the contents of the pleadings." *Guzman v. Astrue*, 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (citing *Juster Assocs. v. City of Rutland*, 901 F.2d 366, 269 (2d Cir. 1990)). The Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (made applicable through 42 U.S.C. § 1383(c)(3)). Put another way, the Court has discretion to determine whether or not a remand is appropriate in evaluating the ALJ's decision. *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004) (quoting § 405(g)); *see Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the

20

[Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (citation omitted).

The Court may overturn the ALJ's decision "only where it is based upon legal error or where its factual findings are not supported by substantial evidence." *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 641 (S.D.N.Y. 2019) (internal quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla"—it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citations omitted); *see Burgess v. Astrue*, 537 F.3d 117, 127–28 (2d Cir. 2008) (citing *Perales*, 402 U.S. at 401); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (same). In applying the substantial evidence standard, the Court "does not determine de novo whether [the Plaintiff] is disabled." *Halloran*, 362 F.3d at 31 (internal quotation marks and citation omitted). Rather, "once an ALJ finds facts, [the Court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Comm'r of the Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original) (internal quotation marks and citation omitted). Though this standard is deferential to an ALJ's finding, an ALJ's disability determination must be reversed or remanded if it is not supported by substantial evidence or if it contains legal error. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). A court must set aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*, 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

## B.     Commissioner's Determination of Disability

Under the SSA, a claimant is disabled if he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental

21

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (internal citations omitted).

If the claimant suffers from mental impairments, the Commissioner "appl[ies] a special technique at the second and third steps of the five-step framework."  *Kelsey v. Comm'r of Soc.*

*Sec.*, 335 F. Supp. 3d 437, 445 (W.D.N.Y. 2018) (quoting *Koler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)).  Specifically, the Commissioner's regulations require that the ALJ determine whether the claimant has medically determinable mental impairments and, if so, "rate the degree of functional limitation resulting from the impairment(s)" across "four broad functional areas" specified in the Commissioner's regulations.  *Kohler*, 546 F.3d at 226 (citing 20 C.F.R. § 404.1520a(b)(2)).  The so-called Paragraph B Criteria include: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  *See* 20 C.F.R. § 404.1520a(c)(4). The ALJ rates the degree of limitation in each functional area on a five-point scale: none, mild, moderate, marked, and extreme.  *Kathryn A. v. Comm'r of Soc. Sec.*, 2023 WL 8596012, at *7 (D. Conn. Dec. 12, 2023) (citing 20 C.F.R. § 404.1520a(c)(4)).  If the claimant's mental disorder results in extreme limitation of one, or marked limitation of two, of the four criteria, the impairment is presumptively disabling at step three.  *Pamela C. v. Bisignano*, 2025 WL 2917094, at *4 (E.D.N.Y. Oct. 14, 2025).

The claimant bears the burden of proof on the first four steps of the analysis.  *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998).  On the fifth step, the burden shifts to the Commissioner to show that claimants can perform work that exists in significant numbers in the national economy.  *See Butts v. Barnhart*, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

## DISCUSSION

Plaintiff challenges the ALJ's decision on multiple grounds.  First, Plaintiff argues that the ALJ failed to fully account for the claimant's limitations in CPP when determining his RFC. Dkt. No. 11 at 11–14 . Second, Plaintiff argues that the ALJ erred in failing to obtain a treating source opinion or otherwise complete the Record.  *Id.* at 14–17.  Plaintiff also argues that "the

ALJ's reliance on the opinions of the state agency review physicians is in error." *Id.* at 17–19. Plaintiff further contends that the ALJ's articulation in support of his conclusions is insufficient. *Id.* Finally, Plaintiff argues that the ALJ improperly evaluated the SSR 16-3p factors by relying on his daily activities to discount his testimony. *Id.* at 19–20.

## I.      Failure to Account for Plaintiff's Limitations in Concentration, Persistence, and Pace

Plaintiff first argues that the ALJ's decision was not supported by substantial evidence because the ALJ's RFC and hypothetical to the VE failed to account for Plaintiff's limitations in CPP. *Id.* at 11.  As defined by the regulations, CPP "refers to the abilities to focus attention on work activities and to stay on-task at a sustained rate," including "working at an appropriate and consistent pace" and "sustaining an ordinary routine and regular attendance at work."  20 C.F.R. part 404, subpt. P, app'x 1.  The ALJ stated that Plaintiff's "complaints of attention difficulties and low motivation are [] factored into the restriction to simple routine work" but otherwise did not explicitly account for his CPP limitations when forming the RFC.  Dkt. No. 9 at 23.  Plaintiff argues that the restriction to simple work failed to adequately account for his limitations in sustaining focus sufficient for a standard workweek and that the ALJ should have included in the RFC a percentage of time "off task," a stated amount of absenteeism, or both.  Dkt. No. 11 at 11.

Plaintiff argues that the ALJ committed reversible error at both Step Four, the RFC determination, and Step Five, the determination of sufficient jobs in the national economy available to Plaintiff.  The alleged errors are similar: the ALJ failed to adequately incorporate Plaintiff's limitation in CPP in the RFC and relied on a hypothetical posed to the vocational expert that did not include the full extent of Plaintiff's limitations, leading the determinations at Step Four and Step Five to be unsupported by substantial evidence.  The Commissioner argues that the ALJ was permitted to not incorporate the moderate limitations in CPP found at Step

Three into the RFC assessment and could instead "conclude that Plaintiff's functional capacity is not impaired by that moderate limitation." Dkt. No. 13 at 9 (citing *Moss v. Comm'r of Soc. Sec.*, 2022 WL 4365349, at *16 (S.D.N.Y. Sept. 20, 2022)); *see Moss*, 2022 WL 4365349, at *16 ("it was not legal error for the ALJ to find that Plaintiff had a severe limitation . . . and then not explicitly incorporate it in her RFC assessment.").

Both parties rely on the Second Circuit's decision in *McIntyre v. Colvin*, 758 F.3d 146 (2d Cir. 2014), in support of their respective positions. In *McIntyre*, the Second Circuit addressed a similar set of alleged errors: the ALJ had found at Step Three that the claimant, McIntyre, had moderate limitations in CPP, but did not explicitly account for this limitation in the RFC at Step Four or in the hypothetical to the vocational expert at Step Five. 758 F.3d at 150–51. The Circuit found that the ALJ did not err in failing to include these non-exertional limitations into the RFC at Step Four, because Step Four findings "need only 'afford[] an adequate basis for meaningful judicial review, appl[y] the proper legal standards, and [be] supported by substantial evidence such that additional analysis would be unnecessary or superfluous." *Id.* at 150 (citing *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013)). Since the ALJ relied on a medical opinion that the plaintiff was "capable of maintaining attention and concentration for tasks and could regularly attend to a routine and maintain a schedule," the ultimate RFC determination was adequately supported by substantial evidence. *Id.* at 150–51. The court held that "an ALJ's decision is not necessarily internally inconsistent when an impairment found to be severe [at Step Two] is ultimately found not disabling" because "the standard for a finding of severity under Step Two of the sequential analysis is de minimis and is intended only to screen out the very weakest cases." *Id.* at 151.

25

However, the Circuit found that the ALJ did err at Step Five because the hypothetical posed to the vocational expert, which closely followed the RFC assessment, failed to explicitly include non-exertional limitations. *Id.* If an ALJ relies on the testimony of a vocational expert at Step Five, there must be "substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion" and those assumptions must "accurately reflect the limitations and capabilities of the claimant involved." *Id.* (internal quotation marks and citations omitted); *see also Sanchez v. Barnhart*, 329 F. Supp. 2d 445, 449 (S.D.N.Y. 2004) ("The ALJ must pose hypothetical questions to the vocational expert which reflect the full extent of the claimant's capabilities and impairments to provide a sound basis for the VE's testimony."). The Circuit thus held that "an ALJ's hypothetical should explicitly incorporate any limitations in concentration, persistence, and pace," *McIntyre*, 758 F.3d at 151, because "the combined effect of a claimant's impairments must be considered in determining disability . . . regardless of whether every impairment is severe," *id.* at 151–52 (quoting *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995)).

Though the court found error, it ultimately held that the ALJ's error at Step Five was harmless. The Circuit explained that the failure to explicitly incorporate limitations in CPP into a hypothetical for the vocational expert is harmless error if "(1) medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, and the challenged hypothetical is limited to include only unskilled work; or (2) the hypothetical otherwise implicitly account[ed] for [the] claimant's limitations in concentration, persistence, and pace." *McIntyre*, 758 F.3d at 152 (internal quotation marks and citation omitted). The Court found that the administrative record supported the conclusion that McIntyre could "engage in 'simple, routine, low stress tasks,'

26

notwithstanding her physical limitations and her limitations in concentration, persistence, and pace" and, by so limiting the hypothetical, the ALJ implicitly acknowledged the limitations and "sufficiently accounted for the combined effect of [McIntyre's] impairments." *Id.* at 152.

In addition to *McIntyre*, the Second Circuit's recent decision in *Nunez v. Commissioner of Social Security*, 164 F.4th 60 (2d Cir. 2025) is instructive here. *Nunez* addressed the Step Four error: the Circuit found that the ALJ's RFC determination, which failed to incorporate limitations in CPP, was not supported with substantial evidence. *Id.* at 70. As in *McIntyre*, the ALJ concluded that Nunez had a "moderate limitation" with respect to "concentrating, persisting, or maintaining pace," but, in contrast to *McIntyre*, the medical opinions were unanimous "that Nunez had some degree of limitation in his abilities to stay on task and maintain a regular work schedule." 164 F.4th at 64. Despite these findings, the ALJ's RFC determination "did not specify any limitations reflecting Nunez's reduced ability to stay on task or attend work regularly" and she did not "provide any reason for or evidence to support her implicit determination that he lacked these limitations." *Id.* at 70. The ALJ solely determined that "[t]he claimant requires a setting that is goal-oriented versus requiring that he maintain a specific pace consistent throughout the day." *Id.* at 69. The Circuit thus remanded due to "[t]he discrepancy between the ALJ's RFC determination, on the one hand, and Dr. Bromley's opinion and the ALJ's express findings regarding Nunez's moderate limitations, on the other." *Id.* at 71. The Circuit additionally focused on the vocational expert's "uncontroverted testimony [which] established that for an individual like Nunez to maintain employment, the individual could not be off task for more than 10% of the workday or absent more than one day per month." *Id.* at 70. This testimony, combined with the ALJ and medical expert's descriptions that plaintiff was

limited "in his ability to sustain an ordinary work routine," "strongly suggest that that Nunez is disabled." *Id.* at 71.

The facts here parallel those in *Nunez*. The ALJ concluded that Plaintiff has a moderate limitation in "concentration, persistence, and pace," Dkt. No. 9 at 20, and each medical expert opined that Plaintiff had moderate limitations in his ability to perform at a consistent pace and sustain regular work attendance, *id.* at 75, 99, 565. The VE testified that to maintain employment, Plaintiff could not be off-task for 15% or more of the workday in addition to regularly scheduled breaks or be absent more than two days of work per month. Dkt. No. 9 at 58–59. As in *Nunez*, the ALJ's RFC determination did not identify any limitations in regard to Plaintiff's ability to sustain concentration or maintain a regular schedule, despite the relevance of these limitations to Plaintiff's ability to find employment. The RFC instead solely provided that Plaintiff is limited to "simple routine tasks."[1] The hypothetical posed to the VE similarly instructed:

> [A]ssume a hypothetical individual of the claimant's age, education, and work experience without exertional limitations. However, this individual would be limited to understanding, remembering, and carrying out simple, routine tasks throughout the eight-hour workday, with regular breaks at two hour intervals, with decision making and changes in work setting only relates to simple, routine tasks and up to occasional interaction with the general public, co-workers, and supervisors.

Dkt. No. 9 at 58. Accordingly, as in *Nunez*, there is a clear discrepancy between the medical opinions and the ALJ's finding of moderate limitations, on one hand, and the ALJ's RFC determination, and the resulting hypothetical posed to VE Conrad, on the other. *See Nunez*, 164 F.4th at 71.

---

[1] The ALJ in *Nunez* was closer to acknowledging limitations in CPP in the RFC than the ALJ here. The ALJ in Nunez noted in the RFC that "claimant requires a setting that is goal-oriented versus requiring that he maintain a specific pace consistent throughout the day." 164 F.4th at 69. Here, the ALJ solely noted that Plaintiff is restricted to "simple routine tasks." Dkt. No. 9 at 20.

However, even with this discrepancy, courts "typically do not remand if 'evidence of record permits us to glean the rationale of an ALJ's decision.'" *Id.* at 71 (quoting *Mongeur*, 722 F.2d at 1040). By determining that Plaintiff is not disabled and crediting the VE's testimony, the ALJ implicitly concluded that Plaintiff has the ability to be on-task for 85% or more of the work day and would not miss two or more days of work in a month. The question raised in this case is thus whether this implicit finding is supported by substantial evidence. *See Nunez*, 164 F.4th at 70 (reviewing the administrative record to "find *any* justification for the ALJ's RFC determination."). To assist in its review, the Second Circuit in *Nunez* created a chart of medical opinions, which the Court finds to be a useful tool here. *See Nunez*, 164 F.4th at 72. Below is a chart of each medical expert's conclusions regarding Plaintiff's ability to sustain concentration and attendance:

| Provider | Date | Opinion |
|---|---|---|
| Dr. Grassl | December 08, 2021 | Plaintiff's attention and concentration is intact because "he could count to 20, do simple calculations, and do serial 7s," Dkt. No. 9 at 564, but Plaintiff is "moderately limited in his ability to sustain concentration and perform a task at a consistent pace, sustain an ordinary routine and regular attendance at work, and regulate emotions, control behavior, and maintain well-being," *id.* at 565 |
| Dr. Hennessey | December 30, 2021 | Plaintiff has "sustained concentration and persistence limitations." *Id.* at 75.<br><br>Plaintiff's "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" is moderately limited. *Id.* at 75.<br><br>Plaintiff's "ability to maintain attention and concentration for extended periods" is not significantly limited. *Id.* at 75.<br><br>Plaintiff's "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" is moderately limited." *Id.* at 76. |

| | | |
|---|---|---|
| | | Concluding, Dr. Hennessey wrote "findings were consistent with moderate limitation in sustained concentration with the ability to complete detailed tasks" and that Plaintiff could perform tasks at, but not beyond, the level of "detailed, non-complex tasks on a consistent basis." *Id.* at 79. |
| Dr. Momot-Baker[2] | April 4, 2022 | Plaintiff has "sustained concentration and persistence limitations." *Id.* at 99.<br><br>Plaintiff's "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" is moderately limited. *Id.* at 99.<br><br>Plaintiff's "ability to maintain attention and concentration for extended periods" is not significantly limited. *Id.* at 99.<br><br>Plaintiff's "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" is moderately limited." *Id.* at 100.<br><br>In conclusion, Dr. Momot-Baker wrote "findings were consistent with moderate limitation in sustained concentration with the ability to complete detailed tasks" and that Plaintiff could perform tasks at, but not beyond, the level of "detailed, non-complex tasks on a consistent basis." *Id.* at 79. |

In summary, each opinion concludes that, even if Plaintiff has periods of intact attention and concentration, Plaintiff has moderate limitations in his ability to complete a workday or work-week without unreasonable breaks, or otherwise perform a task at a consistent pace, and moderate limitations in his ability to maintain regular attendance at work. These opinions are consistent with the ALJ's conclusion that Plaintiff has a moderate limitation in "concentrating, persisting, or maintaining pace" and the ALJ found each expert's opinion persuasive in regard to

---

[2] Dr. Momot-Baker's report precisely parallels Dr. Hennessey's report with respect to CPP. The language used in the reports is therefore similar.

Plaintiff's limitations in concentration, persistence, and pace. Dkt. No. 9 at 20. The record is devoid of medical evidence that would contradict these findings.[3]

The expert opinions do not quantify the extent to which Plaintiff's moderate limitation would impair his attendance or ability to sustain concentration. However, this ambiguity does not detract from Plaintiff's claim of error. The ALJ's decision must be supported by substantial evidence, and none of the medical evidence affirmatively supports the conclusion that Plaintiff would have sufficient concentration and attendance to maintain full-time work. *See Rubin v. O'Malley*, 116 F.4th 145, 155–56 (2d Cir. 2024) ("Nothing in the regulation indicates that an ALJ's ultimate determination . . . of RFC must comport with a specific medical opinion" but the lack of a medical opinion supporting the conclusion is "not insignificant."). Where expert opinions are "ambiguous as to the extent to which Plaintiff could engage in [] tasks on a sustained basis, over the course of a workday, despite [his] limitations with respect to maintaining concentration and attention, and adhering to a regular schedule," such ambiguity inhibits the Court from determining "whether the medical evidence demonstrated that Plaintiff could engage in simple, routine tasks or unskilled work despite [his] limitations." *Stellmaszyk v. Berryhill*, 2018 WL 4997515, at *27 (S.D.N.Y. Sept. 28, 2018)*; see id.* (remanding where medical opinions found limitations in CPP but did not specify degree of absenteeism or off-task time, and ALJ's RFC did not reference either limitation); *cf. Benjamin v. Comm'r of Soc. Sec.*, 2026 WL 697004, at *2 n.2 (2d Cir. Mar. 12, 2026) (summary order) (remand for failure to

---

[3] Dr. Hennessey and Dr. Momot-Baker's conclusion that Plaintiff's ability to concentrate for an extended period is not significantly limited is easily reconciled with their other findings. That Plaintiff could concentrate for a two or even three hour period of time does not mean that he has the ability to consistently complete a full work-week with adequate focus; indeed, both experts concluded that Plaintiff had moderate limitations in his ability to do so and the ALJ found those conclusions persuasive.

account for off-task time would be inappropriate where the state agency consultants affirmatively concluded that plaintiff could "sustain a normal workday and work week"). In the face of this ambiguity, the ALJ was not permitted to speculate as to the extent of impairment that the experts contemplated in concluding that Plaintiff has "moderate limitations." *See Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013). In analogous terms, an ALJ cannot conclude that a claimant can lift 20 pounds occasionally and 10 pounds frequently, as required for "light work," based on a "remarkabl[y] vague" doctor's opinion stating that claimant could lift objects "of a mild degree of weight on an intermittent basis." *Id.* The inference that "mild degree of weight" includes ten pounds required impermissible speculation. *Id.* As applied here, the ALJ could not credit the experts' finding of moderate limitations and then define for himself that these limitations did not impair Plaintiff's ability to focus for 85% of the workday and maintain adequate attendance.

The Court thus cannot conclude that the ALJ's determination at Step Four was supported by substantial evidence. The record reveals no justification for the ALJ's implicit conclusion that Plaintiff would not be off task more than 15% of the workday or miss fewer than two days of work per month, despite noted limitations in maintaining concentration and attendance. *See Nunez*, 164 F.4th at 71.

The next step is to determine whether the ALJ's "error . . . at [S]tep [F]our infected the final determination of his disability status" at Step Five. *Nunez*, 164 F.4th at 73. The ALJ's hypothetical closely followed the RFC determination and failed to explicitly account for Plaintiff's moderate limitation in CPP. Returning to the harmless error factors established in *McIntyre*, the ALJ's error at Step Five was not harmless. As noted above, the medical evidence does not demonstrate that Plaintiff "can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace." *McIntyre*, 758 F.3d at 152. The medical

evidence unanimously concludes that Plaintiff has moderate limitations in maintaining a routine and sustaining focus without unreasonable breaks; the evidence does not support a finding that despite these limitations, Plaintiff would be able to sufficiently sustain focus on tasks or maintain attendance as needed for full time work.

Nor did the ALJ's hypothetical "otherwise implicitly account[] for a claimant's limitations in concentration, persistence, and pace." *Id.*. The ALJ's hypothetical departed from the RFC determination only to specify that the hypothetical individual could carry out simple tasks "with regular breaks at two hour intervals." Dkt. No. 9 at 20. The VE testified that the hypothetical individual would be able to perform work, specifically as a hand packager, cleaner, and small parts assembler, *id.* at 58, but she also testified that if the hypothetical individual were to be "off task 15% of the workday in addition to regular scheduled breaks" or absent from work two days a month, that would preclude all full time work. *Id.* at 58–59. The VE testified that regularly scheduled breaks include fifteen minutes in the morning, fifteen minutes in the afternoon, and half an hour to one hour midday. *Id.* at 59.

The ALJ's specification of regular breaks at two-hour intervals in the hypothetical does not cure the error at Step Four or otherwise suffice to implicitly account for Plaintiff's limitations in concentration, persistence, and pace. VE Conrad testified that regular scheduled breaks in a workday occur at three points throughout an eight-hour day, which in effect breaks a workday into two-hour intervals. *See* Dkt. No. 9 at 59. The ALJ's specification of work at two-hour intervals thus provided no additional limitation that the VE had not already incorporated into the average workday; the two-hour interval appears, from the VE's testimony, to be an assumed aspect of a standard eight-hour day. In other words, the ALJ's specification of regular breaks at two-hour intervals did not impose any additional restriction reflective of Plaintiff's limitations.

Even construing the ALJ's two-hour interval as a restriction based on Plaintiff's limitation in CPP, that restriction fails to implicitly account for Plaintiff's limitations. There is no basis in the record to assume that Plaintiff is able to focus for successive two-hour intervals despite his limitations. Such a determination could only be based on improper speculation as to the meaning of the experts' opinions. Where an ALJ speculates about the precise meaning of "moderate" limitations, "the ALJ, and the reviewing court, run the risk of impermissibly substituting their own opinion for [the doctor's]." *Munnings-Bah v. Saul*, 2020 WL 5755065, at *17 (S.D.N.Y. Sept. 14, 2020). A medical expert's "use of the terms 'moderate' and 'mild,' without additional information" regarding the extent of a claimant's limitation "does not permit the ALJ, a layperson notwithstanding her considerable and constant exposure to medical evidence, to make the necessary inference" that the claimant can meet specific requirements for certain work. *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000); *see id.* (physician's conclusion that claimant had moderate impairment in "lifting and carrying" and mild impairment in "standing and walking, pushing and pulling and sitting" did not permit the ALJ to conclude that claimant could perform sedentary work, which involves two hours of standing or walking, six hours of sitting, and lifting no more than ten pounds at a time); *see also Selian*, 708 F.3d at 421 ("What [the expert] means by 'mild degree' and 'intermittent' is left to the ALJ's sheer speculation . . . At minimum, the ALJ likely should have contacted [the expert] and sought clarification of his report."). As with the implicit conclusion that Plaintiff could focus for more than 15% of the day and maintain adequate attendance, the ALJ's conclusion that Plaintiff can focus for successive two-hour periods of time is unsupported by the record and relies on improper speculation as to the meaning of the medical expert's opinion.

34

In any event, the ALJ's hypothetical did not account, even implicitly, for any degree of absenteeism, despite the experts' consistent finding that Plaintiff had moderate limitations in the ability to "maintain regular attendance." Dkt. No. 9 at 75, 99, 565. The Court cannot conclude that this error was harmless. *See Guzman v. Comm'r of Soc. Sec.,* 2022 WL 2325908, at *9 (S.D.N.Y. June 10, 2022), *report and recommendation adopted*, 2022 WL 2316643 (S.D.N.Y. June 28, 2022) (where treating psychologist opined that Plaintiff would miss more than three days of work per month, "the ALJ's failure to address the issue of how much time Plaintiff would miss in a month based on his ailments, and the VE's testimony that only one absence a month would be tolerated, was legal error"); *Devers v. Comm'r of Soc. Sec.*, 2023 WL 2734431, at *6 (S.D.N.Y. Mar. 31, 2023) (ALJ erred in failing to consider or address how many absences Plaintiff would have per month and how often Plaintiff would be off-task).

Moreover, the ALJ's failure to discuss, or even reference, in his decision the VE's testimony regarding a hypothetical individual who would be off-task more than 15% of the day or miss 2 days of work each month, despite eliciting this testimony, supports the conclusion that the ALJ did not implicitly account for Plaintiff's limitations in CPP. Such an omission "is especially problematic in light of the fact that, when asked to make this seemingly relevant assumption, the VE concluded that the hypothetical individual would not be able to sustain employment." *Stellmaszyk*, 2018 WL 4997515, at *28. As the court in *Stellmaszyk* explained,

> If it was the ALJ's view that, due to Plaintiff's limitations in concentration, attention, and the ability to maintain a schedule, she was likely to be off task for some percentage of the workday, the the ALJ should have made this clear in his RFC determination and taken the VE's testimony on this point into account; if this was not his view, then this, too, should have been explained.

*Id.*; *see also Munnings-Bah*, 2020 WL 5755065, at *20 (remanding where ALJ failed to acknowledge VE's testimony that an individual who could only occasionally concentrate could not sustain work, leaving court unable to determine whether ALJ accounted for plaintiff's

moderate limitations in concentration, persistence, and pace). Since both the RFC and hypothetical "fail to address [Plaintiff's] ability to attend work and stay on task," "the record contain[s] insufficient material to permit the government to carry its burden of demonstrating that jobs in the national economy, suitable for [Plaintiff] given his RFC, exist." *Nunez*, 164 F.4th at 73.

The ALJ thus erred at both Step Four and Step Five, and this error was not harmless. In finding Plaintiff not disabled and crediting the VE's testimony, the ALJ implicitly assumed that Plaintiff could sustain concentration and maintain attendance sufficiently for full-time employment. This conclusion was not supported by substantial evidence. Plaintiff's motion for judgment on the pleadings is therefore granted and the case is remanded to the ALJ for further record development to fully determine (1) Plaintiff's RFC at Step Four, including whether Plaintiff has the capacity to be off task for no less than 15% of the workday and to miss no more than two days of work per month; and (2) whether, at Step Five and in light of the limitations on Plaintiff's ability to focus and maintain attendance, there are jobs in the national economy that Plaintiff could perform.

## II.    Remaining Claims

Since remand is warranted based on the ALJ's failure to adequately account for Plaintiff's limitations in CPP and this error was not harmless, it is not necessary to reach Plaintiff's other arguments. *See Guzman*, 2022 WL 2325908, at *11; *Santos v. Kijakazi*, 2022 WL 4354372, at *8 (S.D.N.Y. Sept. 20, 2022). The Court therefore declines to address Plaintiff's remaining arguments.

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings is

GRANTED.  This case shall be remanded to the Commissioner of Social Security for further

proceedings consistent with this opinion.

The Clerk of Court is respectfully directed to close Dkt. No. 10.


SO ORDERED.


Dated: May 20, 2026
      New York, New York
                             LEWIS J. LIMAN
                      United States District Judge